**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **AEL FINANCIAL, LLC, an Illinois limited liability company,** | ) ) ) | **Case No. 08-cv-3490** |
| | ) | **Judge Dow, Jr.** |
| **Plaintiff,** | ) ) | **Magistrate Judge Mason** |
| **v.** | ) ) ) | |
| **CITY AUTO PARTS OF DURHAM, INC. D/B/A CITY AUTO SALVAGE CITY, a North Carolina corporation, JOSEPH R. GUARGLIA, SR. and JOSEPH R. GUARGLIA, JR.,** | ) ) ) ) ) ) | |
| **Defendants/Third-Party Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **CAPITAL 4, INC., a Texas corporation, ISHMAEL VILLA-LOBOS, P. DAVIS DAWSON, and METROPARK COMMUNICATIONS, INC., a Missouri corporation,** | ) ) ) ) ) | |
| **Third-Party Defendants.** | ) ) ) | |

<u>**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIM AND THIRD-PARTY COMPLAINT**</u>
**(Jury Trial Demanded)**

NOW COME Defendants City Auto Parts of Durham, Inc., d/b/a City Auto Salvage,

Joseph R. Guarglia, Sr., and Joseph R. Guarglia, Jr., answering Plaintiff's Complaint, and allege

and say as follows:

## COMPLAINT

NOW COMES the Plaintiff, AEL FINANCIAL, LLC, an Illinois limited liability company ("AEL"), by and through its attorneys, Brian Ira Tanenbaum and John A. Benson, Jr., of The Law Offices of Brian Ira Tanenbaum, Ltd., brings this Complaint against CITY AUTO PARTS OF DURHAM, INC. d/b/a CITY AUTO SALVAGE CITY [sic] ("City Auto"), JOSEPH R. GUARGLIA, SR., an individual and JOSEPH R. GUARGLIA, JR., an individual (collectively, Joseph R. Guarglia, Sr. and Joseph R. Guarglia, Jr. are sometimes referred to as the "Guarantors")(City Auto and the Guarantors are collectively, the "Defendants") and in support of this Complaint, AEL states as follows:

### I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and that the matter in controversy exceeds, exclusive of interest, costs and attorneys' fees, the sum or value of Seventy Five Thousand Dollars ($75,000.00).

**Answer:**        **Admitted.**

2.    This Court has personal jurisdiction over Defendants pursuant to Illinois' long-arm statute, Ill. Rev. Stat. Ch. 110, para. 2-209 ("Section 209") in that the Defendants, made or performed a contract or promise substantially connected with Illinois and thereby transacted business in Illinois by invoking the benefits and protections of Illinois law in the contractual relationship, as the Equipment Lease (hereinafter defined) and the Guaranty (hereinafter defined) executed by the Defendants is governed and construed by Illinois law.

**Answer:**        **Defendants admit that the Court has personal jurisdiction over them. Defendants deny all remaining allegations in paragraph 2.**

3.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(a).

**Answer:**     **Admitted.**

## II.    THE PARTIES

4.     Plaintiff, AEL Financial, LLC, ("AEL") is an Illinois limited liability company with its principal place of business located at 600 North Buffalo Grove Road, Buffalo Grove, Illinois 60089.  AEL is engaged primarily in the business of leasing certain industrial and commercial equipment to various businesses.

**Answer:**     **Defendants admit, upon information and belief, that Plaintiff is an Illinois limited liability company with its principal place of business located at 600 North Buffalo Grove Road, Buffalo Grove, Illinois 60089.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 4 and these allegations are therefore denied.**

5.     All members of AEL are citizens of the state of Illinois and are therefore diverse in citizenship from each Defendant.

**Answer:**     **Admitted, upon information and belief.**

6.     Upon information and belief, City Auto is a North Carolina corporation and is therefore doing business within the state of North Carolina with its principal place of business at 1301 South Miami Blvd., Durham, North Carolina 27703.

**Answer:**     **Admitted.**

7.     Upon information and belief, Joseph R. Guarglia Sr. is President of City Auto and his residence and state of citizenship is North Carolina.

**Answer:**     **Admitted.**

3

8.      Upon information and belief, Joseph R. Guarglia Jr. is Vice President of City Auto and his residence and state of citizenship is North Carolina.

**Answer:**      **Admitted.**

### III.    THE EQUIPMENT LEASE & GUARANTY

9.      On or about June 28, 2006, AEL, ("Lessor"), entered into a lease agreement (the "Equipment Lease") with City Auto, ("Lessee"), pursuant to which Lessee leased certain equipment ("Equipment") more fully described in the Equipment Lease.  A true and correct copy of the Equipment Lease is attached hereto as Exhibit A and is fully incorporated by reference herein.

**Answer:**      **Denied.  Defendants admit that on or about July 11, 2006, City Auto Parts of Durham, Inc. ("City Auto") executed a funding agreement in furtherance of its 3Com Power of $Zero Customer Agreement ("POZ Agreement") with Capital 4, Inc. ("Capital 4").  Defendants further admit that on or about October 12, 2006, City Auto executed the funding agreement again at the request of its sales agent, Metropark Communications, Inc. ("Metropark").**

10.     Pursuant to the terms and conditions of the Equipment Lease, Lessee was unconditionally obligated, among other things, to make monthly lease payments in an amount equal to Three Thousand Two Hundred Eight Dollars and 87/100 ($3,208.87), plus applicable sales taxes, to AEL for the sixty (60) month period immediately following the commencement of Lessee's obligation to make lease payments under the Equipment Lease.

**Answer:**      **Denied.  Defendants admit that in November or December, 2006, City Auto began receiving a monthly bill from Plaintiff and was instructed by Capital 4 and Metropark Communications, Inc. to send Plaintiff its $3,208.87 monthly payment for public access services (i.e. telephone and internet services) under the POZ Agreement.  City Auto began making these monthly payments once it received its free new 3Com telephone system in early December, 2006.**

4

11.     Since approximately October, 2007, Lessee has failed to make its required

monthly lease payments due AEL under the Equipment Lease, which was on October 12, 2006,

the date Lessee accepted delivery of the Equipment.

**Answer:**     **Defendants admit that City Auto has not made any monthly payments since October, 2007 because its telephone and internet services, as specified in the POZ Agreement, were discontinued. Defendants further admit that City Auto received its free new 3Com telephone system in early December, 2006. Defendants deny all remaining allegations in paragraph 11.**

12.     That demand for complete satisfaction of its obligations under the Equipment

Lease has been made by AEL upon lessee, City Auto, pursuant to a certain letter dated April 22,

2008.  A true and correct copy of the letter is attached hereto as Exhibit B and is fully

incorporated by reference herein.

**Answer:**     **Defendants admit that they received a letter dated April 22, 2008 from John A. Benson, Jr., counsel for Plaintiff.  Defendants deny all remaining allegations in paragraph 12.**

13.     Contemporaneously with the execution by AEL and Lessee of the Equipment

Lease and, in connection therewith, Guarantors executed a certain "Guaranty."  See Exhibit A.

Pursuant to the Guaranty, the Guarantors guaranteed Lessee's performance of its obligations for

the full terms of the Equipment Lease.  The Guaranty is a guaranty of payment and not of

collection.

**Answer:**     **Denied.  Defendants admit that on or about July 11, 2006, Joseph R. Guarglia, Sr. and Joseph R. Guarglia, Jr. executed a funding agreement in furtherance of the POZ Agreement with Capital 4.  Defendants further admit that on or about October 12, 2006, Joseph R. Guarglia, Sr. and Joseph R. Guarglia, Jr. executed the funding agreement again at the request of Metropark.**

14.     AEL has performed all of its duties and obligations under the Equipment Lease and Guaranty required of it to be performed.

**Answer:**     **Denied.**

## IV.    CAUSES OF ACTION

### Count I - Breach of Contract

15.     AEL hereby incorporates each and every allegation set forth herein in Paragraphs 1 through 14 as if more fully set forth herein.

**Answer:**     **Defendants incorporate by reference their answers to Paragraphs 1 through 14.**

16.     AEL entered into the Equipment Lease with City Auto on or about June 28, 2006.

**Answer:**     **Denied.**

17.     The Equipment Lease between AEL and City Auto is a valid and enforceable contract.

**Answer:**     **Denied.**

18.     City Auto materially breached the Equipment Lease without legal justification or excuse by failing to make the required monthly lease payments to AEL since approximately October 2007.

**Answer:**     **Denied.**

19.     AEL has performed all of its obligations under the Equipment Lease.

**Answer:**     **Denied.**

20.     AEL has suffered damages by the loss of use of monies AEL paid for the Equipment.

**Answer:**     **Denied.**

6

21.     That pursuant to the Equipment Lease, AEL is entitled to and has accelerated all rental sums due for the remainder of the term of the Equipment Lease, and AEL is entitled to recover additional late charges and attorneys' fees in connection with the enforcement of the Equipment Lease and this litigation.

**Answer:**     **Denied.**

22.     As of May 29, 2008, the accelerated balance due and owing AEL under the Equipment Lease is Ninety Three Thousand One Hundred Forty Eight Dollars and 83/100 ($93,148.83), plus interest and exclusive of legal fees and court costs.

**Answer:**     **Denied.**

## REQUEST FOR RELIEF

**WHEREFORE**, AEL FINANCIAL, LLC, an Illinois limited liability company, demands a money judgment against CITY AUTO PARTS OF DURHAM, INC. d/b/a CITY AUTO SALVAGE CITY, a North Carolina corporation, as follows:

1.     To recover all losses suffered by AEL, including actual, compensatory and consequential damages and lost profits in the amount to exceed the sum of Ninety Three Thousand One Hundred Forty Eight Dollars and 83/100 ($93,148.83);

2.     Additional damages, as provided by law;

3.     Interest, attorneys' fees, costs and disbursements, as provided under the Equipment Lease; and;

4.     Such other and further relief as this Court may deem just and proper.

**Answer:**     **No answer is required.  If an answer is required, Defendants deny the allegations in this paragraph and deny all liability to Plaintiff.**

7

**Count II - Breach of Guaranty**

**(Against Joseph R. Guarglia, Sr. & Joseph R. Guarglia, Jr. ("Guarantors")**

23.     AEL repeats and reiterates each and every allegation contained in Paragraphs 1 through 22, inclusive, and adopts the same as though fully set forth herein.

**Answer:**     **Defendants incorporate by reference their answers to Paragraphs 1 through 22.**

24.     AEL would not have entered into the Equipment Lease without the Guaranty of the Guarantors with respect to Lessee's obligations under the Equipment Lease.

**Answer:**     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 and these allegations are therefore denied.**

25.     As President and Vice President of Lessee, the Guarantors benefited from the Equipment Lease and the ability of Lessee to use the Equipment.

**Answer:**     **Denied.**

26.     Pursuant to the Guaranty, the Guarantors are liable for the full satisfaction of Lessee's obligations under the Equipment Lease.

**Answer:**     **Denied.**

27.     Lessee has failed to make any monthly payment as required under the Equipment Lease since October 2007, and, as a result, as of May 29, 2008, AEL is owed the accelerated sum of Ninety Three Thousand One Hundred Forty Eight Dollars and 83/100 ($93,148.83) by both the Lessee and the Guarantors.

**Answer:**     **Defendants admit that City Auto has not made any monthly payments since October, 2007 because its telephone and internet services, as specified in the POZ Agreement, were discontinued.  Defendants deny all remaining allegations in paragraph 27.**

8

28.     That demand for complete satisfaction of its obligations under the Equipment

Lease has been made by AEL upon Guarantors pursuant to a certain letter dated April 22, 2008.

A true and correct copy of the letter is attached hereto as Exhibit B and is fully incorporated by

reference herein.

**Answer:**          **Defendants admit that they received a letter dated April 22, 2008 from John
                    A. Benson, Jr., counsel for Plaintiff.  Defendants deny all remaining
                    allegations in paragraph 28.**

**WHEREFORE**, AEL FINANCIAL, LLC, an Illinois limited liability company,

demands a money judgment against JOSEPH R. GUARGLIA, SR. an individual, and JOSEPH

R. GUARGLIA, JR., a citizen of the State of North Carolina, as follows:

1.     To recover all losses suffered by AEL, including actual, compensatory and

consequential damages and lost profits in the amount to exceed the sum of Ninety

Three Thousand One Hundred Forty Eight Dollars and 83/100 ($93,148.83);

2.     Additional damages, as provided by law;

3.     Interest, attorneys' fees, costs and disbursements, as provided under the

Equipment Lease; and "Guaranty;

4.     Such other and further relief as this Court may deem just and proper.

**Answer:**          **No answer is required.  If an answer is required, Defendants deny the
                    allegations in this paragraph and deny all liability to Plaintiff.**

## AFFIRMATIVE DEFENSES

NOW COME Defendants, pursuant to Rule 8(c) of the Federal Rules of Civil Procedure, and hereby allege their affirmative defenses to the claims asserted in Plaintiff's Complaint.

## FIRST DEFENSE
## NO MEETING OF THE MINDS

On or about July 11, 2006 and again on October 12, 2006, Defendants executed a funding agreement with Plaintiff in furtherance of their 3Com Power of $Zero Customer Agreement ("POZ Agreement") with Capital 4, Inc. ("Capital 4").  Under the POZ Agreement, City Auto agreed to pay Capital 4 $3,208.87 per month for a 72-month term (with an option to execute a new agreement after 60 months) and Capital 4 agreed to: (1) provide, maintain, and support City Auto's local and long-distance telephone and internet services (collectively, "public access services"), (2) give City Auto a new 3Com telephone system at no cost, and (3) pay City Auto a one-half cash rebate in the amount of $8,213.95.  Defendants understood that the funding agreement with Plaintiff was for Capital 4's accounting purposes, designed to permit Plaintiff to receive and disburse the monthly fee under the POZ Agreement, and not intended to alter the terms of the POZ Agreement.  Defendants never agreed to lease a new telephone system from Plaintiff and never agreed to pay Plaintiff rent in the amount of $3,208.87 per month for a 60-month term for the privilege of leasing a telephone system worth approximately $17,000.00.  A meeting of the minds did not occur between Defendants and Plaintiff, and Defendants therefore plead the absence of an agreement as an affirmative defense to Plaintiff's claims.

**SECOND DEFENSE**
**LACK OF CONSIDERATION**

The contract alleged in Plaintiff's Complaint, and attached thereto as Exhibit A, described a finance leasing agreement in which City Auto would pay Plaintiff $3,208.87 per month for a 60-month term for the privilege of leasing a 3Com telephone system from Plaintiff. Under the POZ Agreement with Capital 4, City Auto was already entitled to receive this telephone system at no cost. Defendants therefore received no consideration from Plaintiff in exchange for their alleged promise to pay rent. Defendants plead the lack of consideration as an affirmative defense to Plaintiff's claims.

**THIRD DEFENSE**
**MUTUAL AND UNILATERAL MISTAKES OF FACT**

Defendants executed the contract alleged in Plaintiff's Complaint under the mistaken belief that it was a funding agreement as described in the POZ Agreement with Capital 4 and by their sales agent, Metropark Communications, Inc. ("Metropark"). The mistake occurred notwithstanding the exercise of reasonable care by Defendants who reasonably relied upon representations contained in the POZ Agreement and representations from Metropark. Upon information and belief, Plaintiff tendered the alleged contract under the mistaken belief that it was leasing a telephone system to Defendants for a 60-month term. A mutual mistake of fact therefore exists between the parties as to the material terms of the alleged contract. In the alternative, a unilateral mistake occurred which is so severe that the enforcement of the alleged contract would be unconscionable under the circumstances. Defendants plead the affirmative defense of mutual and unilateral mistakes of fact and seek to rescind the alleged contract.

11

## FOURTH DEFENSE
### FRAUD

Upon information and belief, Plaintiff was aware of the terms of City Auto's POZ Agreement with Capital 4 and agreed to serve as the third-party funding source. Notwithstanding its knowledge and agreement, Plaintiff tendered the alleged contract and made false representations to Metropark with the intent to deceive Defendants into mistakenly executing a finance lease for the free telephone system. In the alternative, Plaintiff and Capital 4 were involved in a civil conspiracy to defraud Defendants through the use of a funding agreement that was inconsistent with the terms of the POZ Agreement. Defendants reasonably relied upon the POZ Agreement and Metropark's representations and executed the alleged contract under a mistake of fact. Defendants plead the affirmative defense of fraud and seek to either rescind the alleged contract or reform it to conform to the representations that induced them to execute the funding agreement.

## FIFTH DEFENSE
### UNCONSCIONABILITY

The contract alleged in Plaintiff's Complaint purports to require Defendants to pay Plaintiff the total sum of $192,532.20 for a telephone system that was worth less than 1/10 of this figure and had been provided to City Auto at no cost. Furthermore, the parts of the alleged contract that differed from the POZ Agreement, and which Plaintiff seeks to enforce in this action, consisted of boilerplate in a Times New Roman type face with a 6-point font. The terms of the alleged contract are unconscionable in nature and should not be enforced by this Court. Defendants plead the affirmative defense of unconscionability as a bar to Plaintiff's claims.

12

## SIXTH DEFENSE
## BREACH OF CONTRACT

In the event that the funding agreement is reformed to conform to the promises contained in the POZ Agreement and the course of dealings between the parties, Defendants allege that Plaintiff substantially breached the reformed contract by failing to provide City Auto public access services since October, 2007.  Defendants plead this breach of contract as an affirmative defense to Plaintiff's claims.

## SEVENTH DEFENSE
## CREDIT

Defendants deny all liability to Plaintiff for the claims asserted in the Complaint. However, if Defendants are found liable by a court or jury, Defendants request that the verdict be credited or off-set by all amounts awarded to Defendants as a result of their Counterclaim.

## EIGHTH DEFENSE

Defendants plead as an affirmative defense all claims and allegations which they have raised and asserted in their Counterclaim and Third-Party Complaint to the extent that any of these claims and allegations may bar Plaintiff's claims.

## COUNTERCLAIM AND THIRD-PARTY COMPLAINT

NOW COME Defendants City Auto Parts of Durham, Inc. ("City Auto"), Joseph R. Guarglia, Sr., and Joseph R. Guarglia, Jr., pursuant to Rules 13 and 14 of the Federal Rules of Civil Procedure, asserting a Counterclaim against Plaintiff AEL Financial LLC ("Plaintiff") and a Third-Party Complaint against Third-Party Defendants Capital 4, Inc. ("Capital 4"), Ishmael Villa-Lobos, P. Davis Dawson, and Metropark Communications, Inc. ("Metropark"), and allege and say as follows:

## INTRODUCTION

1.      Plaintiff has sued Defendants for breach of contract and breach of guaranty for failing to pay rent for a new 3Com telephone system that Defendants received from Capital 4 for free under the 3Com Power of $Zero Customer Agreement ("POZ Agreement").  Defendants deny all liability to Plaintiff because they executed the alleged contract under a mutual mistake of fact, a unilateral mistake of fact, and/or fraud.  Defendants seek to either rescind the alleged contract or reform it to correspond to the representations that induced them to execute it.

2.      If the alleged contract is neither rescinded nor reformed, Defendants seek full indemnity from Capital 4 and compensatory damages from Metropark for negligent misrepresentation.  Defendants also seek compensatory and punitive damages plus attorney's fees and costs from Plaintiff for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and from Capital 4 for violations of the Texas Deceptive Trade Practices-Consumer Protection Act.

3.      Finally, Defendants seek to pierce the corporate veil to hold Third-Party Defendants Ishmael Villa-Lobos and P. Davis Dawson personally liable for Capital 4's debts and wrongful conduct.

14

## PARTIES

4.      Defendant City Auto Parts of Durham, Inc. is a North Carolina corporation.  City Auto's principal place of business is located in Durham County, North Carolina.

5.      At all times relevant to this action, City Auto was engaged in the wholesale auto salvage business.

6.      Defendant Joseph R. Guarglia, Sr. is a citizen and resident of Wake County, North Carolina, and president of City Auto.

7.      Defendant Joseph R. Guarglia, Jr. is a citizen and resident of Wake County, North Carolina, and vice-president of City Auto.

8.      Plaintiff AEL Financial LLC is an Illinois limited liability company.  Plaintiff's principal place of business is located in Buffalo Grove, Illinois.

9.      Upon information and belief, Plaintiff's members are all Illinois citizens.

10.      At all times relevant to this action, Plaintiff was engaged in the financial services business.

11.      Third-Party Defendant Capital 4, Inc. is a Texas corporation.  Capital 4's principal place of business is located in Houston, Texas.

12.      At all times relevant to this action, Capital 4 was engaged in the business of providing local and long-distance telephone, internet, and fiber optics services (collectively, "public access services") to its customers.

13.      Upon information and belief, Third-Party Defendant Ishmael Villa-Lobos is a citizen and resident of Houston, Texas.

14.      At all times relevant to this action, Third-Party Defendant Ishmael Villa-Lobos was a shareholder, director, and chief executive officer for Capital 4.

15.     Upon information and belief, Third-Party Defendant P. Davis Dawson is a citizen and resident of Houston, Texas.

16.     At all times relevant to this action, Third-Party Defendant Davis P. Dawson was a shareholder, director, and president for Capital 4.

17.     Third-Party Defendant Metropark Communications, Inc. is a Missouri corporation.  Metropark's principal place of business is located in St. Louis, Missouri.

18.     At all times relevant to this action, Metropark was engaged in the business of selling telecommunications services.

## JURISDICTION AND VENUE

19.     The amount in controversy in this action exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states.

20.     This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1332(a)(1).

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

22.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

23.     In or around May, 2006, City Auto contacted Metropark about a telephone and internet services program called the 3Com Power of $Zero Solution Program ("POZ Program").

24.     Upon information and belief, Metropark was an authorized sales vendor for Capital 4, who owned and administered the POZ Program.

25.     At said time, Metropark informed City Auto that under the POZ Program, City Auto could receive public access services along with a new 3Com telephone system, a cash rebate, or a new telephone system and one-half of the cash rebate for the same cost that City

Auto was paying to its existing providers. City Auto could receive all of these services and features at no additional cost.

26.    Metropark explained that in order to participate in the POZ Program, City Auto had to agree to pay a fixed monthly fee (in an amount equal to City Auto's average monthly expenses for telephone and internet services) for 60 months and allow the Power of $Zero provider, Capital 4, to deal directly with City Auto's existing public access service providers.

27.    Finally, Metropark told City Auto that 3Com Corporation sponsored the POZ Program and Capital 4 served as an intermediary between 3Com and the public access service providers.

28.    Upon information and belief, Metropark's representations were based upon information that it received from Capital 4.

29.    City Auto reasonably relied upon Metropark's representations and applied for the POZ Program.

30.    In the course of its application, City Auto gave Metropark information about the monthly cost of its public access services and Metropark verified this information.

31.    Either Capital 4, or Metropark with Capital 4's consent, approved City Auto for participation in the POZ Program.

32.    After it was approved for the POZ Program, City Auto selected the option of receiving a new 3Com telephone system at no additional cost plus one-half of the cash rebate.

33.    Metropark then notified City Auto in writing that its monthly payment under the POZ Program would be $2,244.89 and that its one-half cash rebate would be $7,901.60. Metropark also gave City Auto information about the new 3Com telephone system that it would receive. A true and accurate copy of the three-page document that Metropark sent to City Auto

17

is attached hereto as Exhibit #1.

34.    Upon information and belief, Metropark sent Exhibit #1 to City Auto with Capital 4's consent.

35.    After receiving the initial quote for services, City Auto asked Metropark to add a Point to Point T-1 fiber optics line to the public access services that City Auto would receive under the POZ Program.

36.    Capital 4, or Metropark with Capital 4's consent, agreed to City Auto's request, which increased City Auto's monthly payment to $3,208.87 and its one-half cash rebate to $8,213.95.

37.    In early July, 2006, Metropark sent City Auto a package with various POZ Program documents, including a 3Com Power of $Zero Customer Agreement ("POZ Agreement") consisting of a one-page customer agreement, a one-page schedule A for City Auto, and a five-page document entitled "How does the 3Com Power of $Zero Solution Work?".

38.    City Auto also received an Equipment Schedule which listed the free 3Com telephone system that it would receive upon execution of the POZ Agreement.  A true and accurate copy of the Equipment Schedule is attached hereto as Exhibit #2.

39.    On or about July 11, 2006, City Auto executed the POZ Agreement and returned it to Metropark with a check payable to 3Com/Capital 4 in the amount of $3,208.87.

40.    Metropark forwarded the POZ Agreement and check to Capital 4, who executed the POZ Agreement and accepted City Auto's check.

41.    The POZ Agreement is a valid and binding contract between City Auto and Capital 4.  A true and accurate copy of the POZ Agreement is attached hereto as Exhibit #3.

18

42.     Under the POZ Agreement, City Auto agreed to pay Capital 4 $3,208.87 per month for a 72-month term (with an option to execute a new agreement after 60 months) and Capital 4 agreed to: (1) provide, maintain, and support City Auto's local and long-distance telephone, internet, and fiber optics services, (2) give City Auto a new 3Com telephone system at no cost, and (3) pay City Auto a one-half cash rebate option in the amount of $8,213.95.

43.     Under the POZ Agreement, City Auto had to execute a funding agreement in order to receive its new 3Com telephone system.

44.     The POZ Agreement described the funding agreement as follows:

17.     **What exactly is a Funding Agreement?**

The Funding Agreement is an agreement between You and Capital 4 Financial Services, a Program of De Lage Landen Financial Services. We use the Funding Agreement to financially leverage the difference in costs between what You pay for Public Access Services, and what it costs Us to provided [sic] those same services. The structure of the Funding Agreement provides for simple accounting treatment of the program's value, while maintaining the Monthly Payment as an operational expense.

18.     **Does that mean I have to pay both the Monthly Payment and the payment due under the Funding Agreement?**

No. As long as You are Our Customer, the payments You make under the Funding Agreement will be credited to Your Monthly Payment obligation, as set forth on Schedule "A".

45.     In addition to the POZ Agreement, the package from Metropark contained a funding agreement entitled "Capital 4 Financial Services Rental Agreement, a program of AEL Financial, LLC."

46.     The funding agreement described the new 3Com telephone system promised by Capital 4 under the POZ Agreement.

47.     The funding agreement recited a fixed monthly payment for a 60-month term in the amount of $3,208.87.

48.     The monthly payment in the funding agreement is the same as the fixed monthly fee in the POZ Agreement.

49.     City Auto had never heard of Plaintiff and therefore called Metropark to ask questions about the funding agreement.

50.     Metropark informed City Auto that the funding agreement merely allowed Plaintiff to receive and disburse City Auto's monthly fee for public access services under the POZ Agreement.

51.     Metropark told Defendants to just sign, initial, and date the funding agreement where a check was shown.

52.     Upon information and belief, the representations that Metropark made about the funding agreement were based upon information that it received from Capital 4 and/or Plaintiff.

53.     Unbeknownst to Defendants, Metropark failed to exercise reasonable care and the information that it supplied to Defendants about the funding agreement was false.

54.     Defendants justifiably and reasonably relied upon the representations in the POZ Agreement, as well as Metropark's representations, and executed Plaintiff's funding agreement.

55.     Unbeknownst to Defendants and contrary to the representations in the POZ Agreement and from Metropark, Plaintiff's funding agreement was a finance lease that purported to lease to City Auto the free 3Com telephone system at a monthly rate in the amount of $3,208.87 for a 60-month term, irrespective of whether City Auto received public access services under the POZ Agreement.

56.     The 3Com telephone system described in Plaintiff's funding agreement has a fair market value of approximately $17,000.00, less than 1/10 of the total rent noted in the funding agreement.

57.     The finance leasing terms in Plaintiff's funding agreement are boilerplate language in 6-point Times New Roman font.

58.     Plaintiff's funding agreement is inconsistent with the terms of the POZ Agreement and the POZ Program.

59.     The funding agreement is unconscionable.

60.     The representations that Defendants received about the funding agreement were false and misleading.

61.     Defendants executed the funding agreement under a mistake of fact that the agreement was intended to allow Plaintiff to receive and disburse City Auto's monthly fee for public access services under the POZ Agreement.

62.     Upon information and belief, Plaintiff tendered the funding agreement to Defendants under a mistake of fact that the POZ Agreement allowed it to lease City Auto the 3Com telephone system for a 60-month term at the rate of $3,208.87 per month.

63.     In the alternative and upon information and belief, Plaintiff was aware of the terms of the POZ Agreement, agreed to serve as the third-party funding source, and falsely informed Metropark that the funding agreement complied with the POZ Agreement and/or POZ Program.  Plaintiff made this misrepresentation and tendered the funding agreement with the intent to deceive Defendants into executing the funding agreement to their detriment.

64.     In or around October, 2006, Metropark notified Defendants that they had to sign Plaintiff's funding agreement a second time.

65.     Metropark told Defendants that this funding agreement was the same document that they executed in July, 2006 and that they just needed to sign, initial, and date the agreement where a check was shown, and return it by mail.

66.     Metropark neglected to tell Defendants that its prior representations about the purpose of Plaintiff's funding agreement were false.

67.     Metropark also neglected to tell Defendants that the funding agreement was contrary to the POZ Agreement, as well as Metropark's prior representations, and purported to lease to City Auto the free 3Com telephone system at a monthly rate in the amount of $3,208.87 for a 60-month term, irrespective of whether City Auto received public access services under the POZ Agreement.

68.     Metropark failed to exercise reasonable care in supplying information to Defendants about the funding agreement.

69.     On or about October 12, 2006, Defendants received Plaintiff's funding agreement.

70.     The second funding agreement was the exact same document that Defendants executed in July, 2006.

71.     Defendants justifiably and reasonably relied upon the representations in the POZ Agreement, as well as the prior representations of Metropark, and again executed Plaintiff's funding agreement under a mistake of fact.

72.     The funding agreement that Defendants executed in July and October, 2006 is the contract alleged in Plaintiff's Complaint.

73.     Upon information and belief, Plaintiff either tendered the funding agreement under the same mistake of fact described in paragraph 61 above, or intended to deceive Defendants into executing a funding agreement that was contrary to the terms of the POZ

Agreement as alleged in paragraph 62 above.

74.    Defendants would have never executed Plaintiff's funding agreement if they had been told about its true contents.

75.    Defendants were not represented by legal counsel in any of these transactions and relied upon the truth of the information that they received from their sales agent Metropark.

76.    Plaintiff's funding agreement contained Capital 4's logo.

77.    Upon information and belief, Capital 4 approved the terms of Plaintiff's funding agreement and approved its submission to Defendants.

78.    Upon information and belief, Capital 4 knew that Plaintiff's funding agreement was inconsistent with the POZ Agreement and rendered statements about the POZ Program false. Capital 4 approved the funding agreement so that it would receive an immediate lump sum payment from Plaintiff.

79.    Upon information and belief, the POZ Program was a pyramid scheme in which funds derived from new customers were used to pay for public access services for existing customers while providing substantial income to Third-Party Defendants Ishmael Villa-Lobos and P. Davis Dawson. When an insufficient number of new customers could be enrolled in the POZ Program, Capital 4 became unable to provide public access services.

80.    In addition, Capital 4's POZ Agreement contained false and misleading representations that: (a) 3Com had sponsored and approved the POZ Agreement; (b) Capital 4 provided public access services on par with companies like AT&T or MCI; and, (c) De Lage Landen Financial Services was a participant in the funding agreement.

81.    Under the terms of the POZ Agreement, Capital 4 was required to tender the one-half cash rebate to City Auto once Plaintiff accepted the funding agreement.

23

82.    Capital 4 never tendered the one-half cash rebate to City Auto even though Plaintiff accepted the funding agreement in or around November, 2006.

83.    Capital 4 materially breached the POZ Agreement by failing to tender the one-half cash rebate to City Auto.

84.    Upon information and belief, Capital 4 never intended to honor its agreement to give City Auto a one-half cash rebate in the amount of $8,213.95.

85.    In or around November or December, 2006, City Auto received a monthly invoice from Plaintiff under the POZ Program.

86.    Plaintiff's invoice included the $3,208.87 monthly fee for public access services under the POZ Agreement and funding agreement, plus an insurance premium charge in the amount of $74.90.

87.    After receiving the invoice, City Auto contacted Metropark and Capital 4.  Both Metropark and Capital 4 told City Auto that it should send its monthly payment under the POZ Agreement to Plaintiff because Plaintiff would be collecting and disbursing the monthly fees for public access services.

88.    City Auto also contacted Plaintiff to inquire about the insurance premium charge.  Plaintiff informed City Auto that the insurance premium charge had to be paid.

89.    During the early part of December, 2006, City Auto received its 3Com telephone system from Metropark.

90.    After the telephone system was delivered and installed, City Auto began receiving public access services under the POZ Agreement.

91.    In January, 2007, City Auto began tendering a monthly payment to Plaintiff in the total amount of $3,283.77, consisting of $3,208.87 as noted in the POZ Agreement and the

24

$74.90 insurance premium.

92.      In late September, 2007, City Auto's public access services were discontinued.

93.      City Auto has not received public access services under the POZ Agreement since late September, 2007.

94.      Plaintiff has known since late September, 2007 that City Auto was no longer receiving public access services under the POZ Agreement.

95.      Once its services were discontinued, City Auto obtained public access services from Big City Networks, Affinity Network, Nuvox Communications, and Time Warner Cable.

96.      Capital 4 materially breached the POZ Agreement in late September, 2007 by failing to provide public access services to City Auto.

97.      After Capital 4 breached the POZ Agreement, City Auto properly terminated the Agreement for good cause.

98.      Under paragraph 34 of the POZ Agreement, Capital 4 agreed, in the event that the Agreement was terminated for good cause, to indemnify Defendants by paying all sums that they might owe under the funding agreement.

99.      After City Auto's public access services were discontinued, Plaintiff notified Defendants that their $3,208.87 monthly payment consisted of $1,408.68 for services and $1,800.19 for the telephone system.  Plaintiff directed City Auto to reduce their monthly payment to $1,800.19.

100.     City Auto did not make the $1,800.19 monthly payment because it was no longer receiving any public access services under the POZ Agreement.

101.     In late April, 2008, counsel for Plaintiff sent Defendants a letter stating that "the monthly lease payments due under the Rental Agreement are $1,800.19" and demanding an

immediate payment in the amount of $14,401.52 for sums allegedly due since October, 2007.

102.   Counsel for Plaintiff's correspondence also stated that if Plaintiff did not receive a payment by May 5, 2008, then Defendants would owe approximately $81,529.00 plus attorneys' fees and court costs.

103.   On May 23, 2008, Defendants responded to Plaintiff's demands for payment by describing the mistakes and fraud that occurred in this matter and requesting that Plaintiff void the funding agreement.

104.   Plaintiff rejected Defendants' request and filed this lawsuit.

## FIRST COUNT
### MUTUAL OR UNILATERAL MISTAKES OF FACT

105.   The allegations set forth in the preceding paragraphs are incorporated herein by reference.

106.   Defendants executed Plaintiff's funding agreement in July, 2006, and again in October, 2006, under a mistake of fact that the purpose of the agreement was to allow Plaintiff to handle City Auto's monthly fee for public access services under the POZ Agreement.

107.   Upon information and belief, Plaintiff tendered the funding agreement to Defendants under a mistake of fact that the POZ Agreement allowed it to lease City Auto the 3Com telephone system for a 60-month term at the rate of $3,208.87 per month.

108.   The mutual mistakes of fact by Defendants and Plaintiff relate to the subject matter of the funding agreement, a material feature of the alleged contract.

109.   In the alternative, a unilateral mistake of fact occurred that is of such grave consequence that enforcement of the funding agreement would be unconscionable under the circumstances.

110.    The mistake by Defendants was caused by representations that were made in the POZ Agreement and by their sales agent Metropark, and occurred notwithstanding Defendants' exercise of reasonable care.

111.    Upon information and belief, Plaintiff can be returned to the status quo if the funding agreement were rescinded.

112.    Defendants therefore request that the funding agreement be rescinded on the grounds of a mutual or unilateral mistake of fact.

**SECOND COUNT**
**FRAUD**

113.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

114.    Plaintiff was aware of the terms of the POZ Agreement and agreed to serve as the third-party funding source.

115.    Upon information and belief, despite its knowledge and agreement, Plaintiff tendered the funding agreement to Defendants and falsely represented to Metropark that the agreement complied with the POZ Agreement.

116.    In the alternative and upon information and belief, Plaintiff and Capital 4 were involved in a civil conspiracy to defraud Defendants through the use of a funding agreement that was inconsistent with the terms of the POZ Agreement.

117.    Plaintiff tendered the funding agreement and made false representations to Metropark with the intent to induce and deceive Defendants into executing the funding agreement to their detriment.

118.    Defendants reasonably relied upon the representations in the POZ Agreement as well as the representations of Metropark and mistakenly executed the funding agreement.

119.    Upon information and belief, Plaintiff can be returned to the status quo if the funding agreement were rescinded.

120.    Defendants therefore request that the funding agreement be rescinded on the grounds of fraud.

121.    In the alternative, Defendants request that the funding agreement be reformed to conform to the representations that induced them to execute the funding agreement.

## THIRD COUNT
## VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD
## AND DECEPTIVE BUSINESS PRACTICES ACT
## BY PLAINTIFF

122.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

123.    Plaintiff submitted a funding agreement to Defendants in July, 2006, and again in October, 2006, that it knew, or reasonably should have known, was inconsistent with the POZ Program and the terms of the POZ Agreement.

124.    Upon information and belief, Plaintiff falsely represented to Metropark that the funding agreement complied with the POZ Agreement with the intent that the false representations would be conveyed to Defendants.

125.    Upon information and belief, Plaintiff engaged in willful acts of deception and fraud, and made intentional misrepresentations of material fact in order to induce Defendants to rely upon them and execute the funding agreement.

28

126.    Plaintiff's acts of deception, fraud, and material misrepresentations concerning the funding agreement occurred in the course of conduct affecting trade and commerce.

127.    Defendants justifiably relied upon Plaintiff's wrongful conduct and executed the funding agreement to their detriment.

128.    Plaintiff's conduct in its dealings with Defendants violates the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.*

129.    Defendants have suffered actual economic damages as a direct and proximate result of Plaintiff's wrongful conduct.

130.    In addition to actual damages, Defendants are entitled to recover punitive damages, attorneys' fees, and costs from Plaintiff.

## FOURTH COUNT
### INDEMNITY BY CAPITAL 4

131.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

132.    On or about July 11, 2006, a valid and binding contract was formed between City Auto and Capital 4 as memorialized in the POZ Agreement.

133.    Capital 4 breached the material terms of the POZ Agreement by discontinuing City Auto's public access services in late September, 2007 and by failing to send City Auto a one-half cash rebate in the amount of $8,213.95.

134.    As a result of Capital 4's breach of contract, City Auto properly terminated the POZ Agreement for good cause.

135.    Under paragraph 34 of the POZ Agreement, Defendants are entitled to full indemnity from Capital 4 for all damages that Defendants may owe Plaintiff under the funding

agreement.

136.     In the event that a court or jury holds Defendants liable to Plaintiff, Defendants request full indemnity from Capital 4 for all damages, attorneys' fees, and costs that may be assessed against them.

**FIFTH COUNT**
**NEGLIGENT MISREPRESENTATION**
**BY METROPARK**

137.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

138.     In July, 2006, Defendants contacted Metropark about the funding agreement that accompanied the POZ Agreement and POZ Program documents.

139.     Defendants asked Metropark questions about Plaintiff, the funding agreement, and the POZ Program.

140.     In response, Metropark informed Defendants that they should sign, initial, and date the funding agreement where indicated because the agreement merely allowed Plaintiff to receive and disburse City Auto's monthly fee for public access services in accordance with the POZ Agreement.

141.     Unbeknownst to Defendants, Metropark failed to exercise reasonable care and the information that Metropark supplied about the funding agreement was false.

142.     Upon information and belief, Metropark never read the funding agreement before answering Defendants' questions.

143.     Metropark answered Defendants' questions in the course of its sales business and supplied this information for Defendants' guidance in determining whether or not they should execute the funding agreement and participate in the POZ Program.

30

144.     On or about July 11, 2006, Defendants justifiably relied upon the information that they received from Metropark and executed the funding agreement to their detriment.

145.     In October, 2006, Metropark notified Defendants that they had to sign Plaintiff's funding agreement a second time.

146.     Metropark told Defendants that this funding agreement was the same document that they executed in July, 2006 and that they just needed to sign, initial, and date the agreement where a check was shown, and return it by mail.

147.     Metropark neglected to tell Defendants that (a) its prior representations about the purpose of Plaintiff's funding agreement were false and (b) the terms of the funding agreement were contrary to the POZ Agreement and Metropark's prior representations.

148.     Metropark failed to exercise reasonable care in the course of supplying information to Defendants about the funding agreement.

149.     On or about October 12, 2006, Defendants justifiably and reasonably relied upon the information that they received from Metropark in July and October, 2006, and again executed Plaintiff's funding agreement to their detriment.

150.     As a direct and proximate result of their reliance in July and October, 2006, Defendants incurred actual economic damages.

151.     Defendants are entitled to recover compensatory damages from Metropark under the Missouri common law tort of negligent misrepresentation.

**SIXTH COUNT**
**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE**
**PRACTICES-CONSUMER PROTECTION ACT**
**BY CAPITAL 4**

152.     The allegations set forth in the preceding paragraphs are incorporated herein by

reference.

153.     In its dealings with Defendants, Capital 4 engaged in the following false,

misleading, or deceptive acts or practices prohibited under VTCA, Business & Commerce Code

§ 17.46(b) of the Texas Deceptive Trade Practices-Consumer Protection Act:

   a.     Causing confusion or misunderstanding as to 3Com's sponsorship,
           approval, or certification of the services provided under the POZ
           Agreement;

   b.     Representing that the services provided under the POZ Agreement were
           sponsored or approved by 3Com;

   c.     Representing the services provided under the POZ Agreement were of a
           quality comparable to services provided by telecommunications
           companies like AT&T or MCI;

   d.     Representing that the funding agreement was sponsored or approved by
           De Lage Landen Financial Services;

   e.     Representing that Plaintiff's funding agreement was consistent with the
           POZ Agreement, for "simple accounting" purposes, and merely intended
           to allow Plaintiff to collect and disburse the fixed monthly fee for public
           access services; and,

   f.     Upon information and belief, promoting a pyramid scheme.

154.     The false, misleading, or deceptive acts or practices alleged in the preceding

paragraph were done by Capital 4 in the course of conduct affecting trade and commerce.

155.     Defendants relied upon Capital 4's misconduct to their detriment and executed

the POZ Agreement and funding agreement with Plaintiff.

32

156.    Capital 4's conduct violated the Texas Deceptive Trade Practices-Consumer Protection Act, VTCA, Business and Commerce Code § 17.41, *et seq.*, and was fraudulent and grossly negligent.

157.    In addition, the manner in which Capital 4 handled the funding agreement was an unconscionable course of action which took advantage of Defendants' lack of knowledge and experience to a grossly unfair degree.

158.    As a direct and proximate result of Capital 4's wrongful conduct, Defendants incurred actual economic damages.

159.    In addition to actual damages, Defendants are entitled to recover punitive damages, attorneys' fees, and costs from Capital 4.

**SEVENTH COUNT**
**CIVIL CONSPIRACY**

160.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

161.    Upon information and belief, Plaintiff and Capital 4 had an agreement to allow Plaintiff to surreptitiously obtain a fraudulent funding agreement from Defendants for a 60-month lease of the free 3Com telephone system at the monthly public access service rate specified in the POZ Agreement.

162.    A civil conspiracy existed between Plaintiff and Capital 4.

163.    Plaintiff and/or Capital 4 engaged in fraudulent, deceptive, and wrongful conduct in furtherance of the civil conspiracy.

164.    Defendants request that Plaintiff and Capital 4 be held jointly and severally liable for all actual economic damages that Defendants suffered as a direct and proximate result of the

wrongful conduct that was committed in furtherance of the civil conspiracy.

## EIGHTH COUNT
## PIERCING THE CORPORATE VEIL

165.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

166.    Upon information and belief, at all times relevant to this action, Third-Party Defendants Ishmael Villa-Lobos and P. Davis Dawson were the sole shareholders, officers, and directors of Capital 4.

167.    Third-Party Defendants Villa-Lobos and Dawson inadequately capitalized Capital 4 so that Capital 4 is financially unable to satisfy its outstanding debts and liabilities.

168.    Upon information and belief, Third-Party Defendants Villa-Lobos and Dawson exercised complete control and domination over Capital 4's POZ Program such that in Capital 4's dealings with Defendants the corporate entity had no separate mind, will, or existence of its own.

169.    Upon information and belief, Third-Party Defendants Villa-Lobos and Dawson exercised complete control and domination over Capital 4 for the purpose of committing the wrongful conduct alleged above in the Sixth and Seventh Counts.

170.    At all times relevant to this action, Capital 4 was a mere instrumentality and alter ego of Third-Party Defendants Villa-Lobos and Dawson.

171.    Defendants request that Third-Party Defendants Villa-Lobos and Dawson be held jointly and severally liable for all actual economic damages that Defendants suffered as a result of Capital 4's wrongful conduct.

## JURY DEMAND

Defendants demand a trial by jury on all contested issues of fact raised in this civil action.

## PRAYER FOR RELIEF

WHEREFORE, Defendants pray the Court for a Judgment that:

1.    Dismisses with prejudice Plaintiff's Complaint, and all claims included therein, and awards Plaintiff no compensatory damages;

2.    Either rescinds the contract alleged in Plaintiff's Complaint or reforms the contract to correspond to the representations that induced Defendants to execute it;

3.    In the alternative, if the contract is enforced, allows Defendants to be indemnified in full and held harmless by Capital 4 for all compensatory damages, court costs, and attorneys' fees that may be awarded Plaintiff;

4.    Awards Defendants compensatory damages, punitive damages, and reasonable attorneys' fees from Plaintiff and Capital 4, either jointly and severally or individually, for the Third, Sixth, and Seventh Counts asserted in Defendants' Counterclaim and Third-Party Complaint;

5.    Pierces the corporate veil and holds Third-Party Defendants Villa-Lobos and Dawson jointly and severally liable for all damages, costs, and attorneys' fees assessed against Capital 4;

6.    Awards Defendants compensatory damages from Metropark for the Fifth Count asserted in Defendants' Third-Party Complaint;

7.    Allows Defendants to recover their court costs from Plaintiff, Capital 4, Metropark, or Third-Party Defendants Villa-Lobos and Dawson; and,

8.    Grants Defendants such further relief as may be deemed just and proper.

This the 22nd day of August, 2008.

/s/ Carlos E. Mahoney
Carlos E. Mahoney
Glenn, Mills, Fisher & Mahoney, P.A.
P. O. Drawer 3865
Durham, North Carolina 27702-3865
Telephone: (919) 683-2135
Fax: (919) 688-9339
cmahoney@gmf-law.com
N.C. State Bar No. 26509
Counsel for Defendants, appearing *pro hac vice*

Robert S. Bell, Jr.
Law Offices of Cary J. Collins, P.C.
2200 West Higgins Road, Suite 155
Hoffman Estates, IL 60195
Telephone: (847) 519-0010
Fax: (847) 519-0016
rsbelljr@sbcglobal.net
Local Counsel for Defendants

## CERTIFICATE OF SERVICE

I, Carlos E. Mahoney, hereby certify that on August 22, 2008, I electronically filed the

foregoing document entitled, **Defendants' Answer, Affirmative Defenses, Counterclaim, and**

**Third-Party Complaint,** with the Clerk of Court for the Northern District of Illinois using the

CM/ECF system which will send notification of the filing to all attorneys in this action.

Respectfully submitted,

 /s/ Carlos E. Mahoney
Carlos E. Mahoney
Glenn, Mills, Fisher & Mahoney, P.A.
P. O. Drawer 3865
Durham, North Carolina 27702-3865
Telephone: (919) 683-2135
Fax: (919) 688-9339
cmahoney@gmf-law.com
N.C. State Bar No. 26509
Counsel for Defendants, appearing *pro hac vice*

 

**Welcome to the 3Com Power of $Zero™ Solution.** As you have already learned, this unique financial product can be used to provide all of your local and long distance phone and network access services ("Public Access Services"), while simultaneously reducing those expenses to $Zero™.

Grant us the privilege to deliver all of your Public Access Services, and we shall, in turn, deliver to you, a payment (in the form of a state-of-the-art 3Com telephone system, or a cash payment). The value that the 3Com Power of $Zero™ Solution delivers to you is your share of the profits, which, otherwise, would be pocketed by the telecom vendors that you are currently using. Eventually, the compounded future value of the phone system and cash payments returned to you will reduce all of your telecom expenses to $Zero. The significance of this contribution can be seen in the attached Schedule A.

Please take the time to review the Schedule A; study the "How Does the Power of $Zero™ Solution Work?"; and read our customer testimonials. If you have any questions or concerns about how our program works, what you can expect, and how soon you can get started, contact your Metropark Power of Zero Specialist.

To Access Movies, Brochures and Case Studies:
**http://www.metropark.com/poz**

To Access your Power of $Zero™ eBrochure:
**http://www.c4powerofzero.com**

Username:    cityauto

Password:    password





EXHIBIT

1

 

# 3Com's Power of $Zero Program

| | | |
|---|---|---|
| **Applicant:** | **City Auto Salvage** | |
| **Monthly Payment** | **$2,244.89** | *Based on your existing bills* |
| **Program Rebate** | **$7,901.60** | *Paid upon installation and acceptance of 3Com phone system directly to you* |

## 3Com IPN Service:

| QTY | | |
|---|---|---|
| 1 | IPN Circuit Installation | Included |
| 1 | IPN Circuit Set-up | Included |
| 0 | IPN Analog Voice Line | Included |
| 1 | IPN Analog Fax Line | Included |
| 0 | IPN Analog Modem Line | Included |
| 0 | IPN Digital T1 Trunks | Included |
| 23 | IPN Digital PRI Trunks | Included |
| 30 | Direct Inward Dialing Numbers (DID) | Included |
| | *Caller ID* | Included |
| 0 | *Calling Cards* | Included |
| | *Managed Router Service* | Included |
| 12,000 | Long Distance Minutes (benchmark) | Included |
| 2mb/4mb | Dedicated Private / Internet Bandwidth | Included |
| 0 | Domain Web Site Hosting | Included |
| 0 | Email Accounts | Included |

> Long Distance charges will be charged at 5 cents per minute over and credited at 5 cents per minute under the listed benchmark minutes. These monthly charges or credits will be reconciled and billed/credited quarterly

## Telephony System:        3Com NBX V3000 Voice & Data System

| QTY | | |
|---|---|---|
| 1 | 3Com NBX V3000 System | Included |
| 1 | 3Com NBX 4 Slot Chassis | Included |
| 1 | 3Com NBX T1/PRI Card | Included |
| 0 | 3Com NBX 4 port Analog Line Card | Included |
| 0 | 3Com NBX 4 port Analog Station Card | Included |
| 4 | 3Com NBX Voicemail ports | Included |
| 400 | 3Com NBX Voicemail storage hours | Included |
| 0 | 3Com NBX 3101 Basic Speakerphone | Included |
| 32 | 3Com NBX 3102 Executive Speakerphone | Included |
| 0 | 3Com NBX 3103 Manager Speakerphone | Included |
| 0 | 3Com NBX 3105 Operator Console Adjunct | Included |
| 0 | 3Com NBX 3106 Cordless Phone | Included |
| 2 | 3Com Power-over-Ethernet 24port Switch | Included |
| 1 | Installation, Training, Maintenance, Warranty Package | Included |

Schedule A for City Auto Salvage

| Monthly Operational Expenses | | | |
|---|---|---|---|
| Notes & Acct. Info. | Carrier | Description | Expense |
| maintenance | Capital4 | *Total Bill | $112.00 |
| 12000 LD Benchmark minutes | other | | $0.00 |
| 164761 | Nuvox | *Total Bill | $1,670.00 |
| 1281987-01 | Time Warner | *Total Bill | $462.89 |
| Current Monthly Payment | | | $2,244.89 |

| Additional Expenses - Contract and Lease Buyouts | | | |
|---|---|---|---|
| All contracts and leases which are being assumed under this agreement must be listed below by carrier, term remaining, and monthly payment obligation. Capital 4 is only obligated to discharge those obligations listed below. Any obligations not listed shall remain the customer's responsibility. | | | |
| $892.43 X 4 months = $3569.72 | | Contract Buyout | $0.00 |
| **Total Monthly Payment** | | | **$2,244.89** |

| Quantifying Your 3Com Power of $Zero™ Value Proposition | |
|---|---|
| Your Monthly Expense | $2,244.89 |
| (A) Your Total Monthly Expense over a ten-year period | $269,386.80 |
| | |
| (B) Future Value of Our Initial and Renewal Contributions at end of Year 10, based upon IROC of 12.62% | $269,386.80 |
| **(A-B) Your net expense for services over a ten-year period** | **$Zero™** |



**Equipment Schedule for City Auto Salvage**

| Description | Part No. | Quantity |
|---|---|---|
| *NBX Phone 3102 Business + Warranty (Requires 3C10 | 3C10402A+Warranty | 32 ✓ |
| *NBX Chassis V5000 (adds 4 slots) | 3C10200B-US | 1 |
| *NBX Card T1/PRI (Digital Line Card) | 3C10116D | 1 |
| *NBX License - Phone, Group 2 | 3C10412 | 18 |
| *NBX Processor/Chassis V3000 | 3C10600A-US | 1 |
| Router Variable/Ethernet Chassis 5012 | 3C13701-US | 2 |
| *Switch Baseline 2226-PWR Plus | 3C16490-US | 2 |
| *NBX Attendant Console 3105 + Warranty(Requires 3C | 3C10405A+Warranty | 1 |

**EXHIBIT**
tabbies®
2

# Customer Agreement

Capital 4 and Customer (as defined below) enter this 3Com Power of $Zero™ Customer Agreement (the "Agreement"), under which Capital 4 shall provide, maintain, and support all of Customer's Public Access Services in accordance with the "How Does the 3Com Power of $Zero™ Solution Work?" section of the eBrochure (the "Terms"); and Customer enters the Funding or Rental Agreement (the "Funding Agreement"), under which Customer shall obtain its selected telephone system or other valuable options ("Voice Technology Solutions").

- Customer agrees to enter into the Agreement, including the attached Schedule "A" which reflects Customer's total monthly payment amount, which will hereafter include both the Customer's Public Access Services and the amortized value of the option selected herein.
- Customer's acceptance of the Agreement is based upon Customer's election of the following (please initial choice to show election):

  _____ the Equipment Option with a value of $68,848.00;

  _____ the Cash Rebate Option in the amount of $16,427.91; or

  ✓ both the Equipment Option and one-half of the Cash Rebate Option with a value of $77,061.95.
- Customer agrees that Capital 4's acceptance of the Agreement is subject to the Terms, and the acceptance by Capital 4 of the Funding Agreement is subject to Customer being credit approved.
- Customer agrees that he/she has been provided with password access to Customer's eBrochure on the 3Com Power of $Zero ™ Solution website, and that he/she has logged on and reviewed and evaluated the Schedule A as set forth in Customer's eBrochure.
- Customer agrees that he/she has been provided with password access to Customer's eBrochure on the 3Com Power of $Zero ™ Solution website, and that he/she has logged on and reviewed and evaluated the explanation of the 3Com Power of $Zero™ Solution, as set forth in the section titled, "How Does the 3Com Power of $Zero™ Solution Work?"
- Customer understands that all of the matters set forth in the section of the eBrochure titled, "How Does the 3Com Power of $Zero™ Solution Work?" are the Terms which are expressly incorporated by reference, as part of the Agreement.
- Customer agrees that he/she has had an opportunity to evaluate the 3Com Power of $Zero™ Solution, and ask any questions regarding the 3Com Power of $Zero™ Solution. Having done so, he/she voluntarily agrees to enter into this Agreement for 72 months.

Executed on this ___ day of _____, 2006.

**City Auto Salvage**

By: _Joseph M Quagliea_

Title _Pres._

("Customer's Place of Business")

Phone:_____

Fax: _____

E-mail:_____

**Capital 4, Inc.**

By: _____

Title_____

1010 North San Jacinto

Houston, Texas 77002

Phone: 713-228-9928

Fax: 713-237-1118

E-mail: support@capital4.com

**EXHIBIT**

tabbies®

3

Schedule A for City Auto Salvage

| Monthly Operational Expenses | | | |
|---|---|---|---|
| Notes & Acct. Info. | Carrier | Description | Expense |
| maintenance | Capital4 | *Total Bill | $112.00 |
| 12000 LD Benchmark minutes | other | Long Distance | $0.00 |
| 164761 | Nuvox | *Total Bill | $1,670.00 |
| 1281987-01 | Time Warner | *Total Bill | $462.89 |
| Add P2P T-1 | other | Point to Point T-1 | $950.00 |
| Current Monthly Payment | | | $3,194.89 |

| Additional Expenses - Contract and Lease Buyouts | | | |
|---|---|---|---|
| All contracts and leases which are being assumed under this agreement must be listed below by carrier, term remaining, and monthly payment obligation. Capital 4 is only obligated to discharge those obligations listed below. Any obligations not listed shall remain the customer's responsibility. | | | |
| | | Equipment Shortfall | $13.98 |
| Total Monthly Payment | | | $3,208.87 |

| Quantifying Your 3Com Power of $Zero™ Value Proposition | |
|---|---|
| Your Monthly Expense | $3,208.87 |
| (A) Your Total Monthly Expense over a ten-year period | $385,064.22 |
| (B) Future Value of Our Initial and Renewal Contributions at end of Year 10, based upon IROC of 14.17% | $385,064.22 |
| (A-B) Your net expense for services over a ten-year period | $Zero™ |



# How does the 3Com Power of $Zero Solution Work?

**1.   What is the 3Com Power of $Zero™ Solution?**

The 3Com Power of $Zero™Solution is a financial product under which your company, as a customer ("You", "Your", or the "Customer"),can receive, *at $Zero™ additional cost to You:* (1) the Equipment Option; (2) the Cash Payment Option; or (3) the Equipment*and* One-Half Cash Payment Option, in return for Your commitment to allow Capital 4, Inc. ("Capital 4", "We", "Us", or "Our") to provide, maintain, and support Your Voice or Data Technology Solutions, and Your local telephone or data lines, internet access facilities, domestic and international long distance services, cellular servicesand all other network access services (collectively the "Public Access Services").

**2.   How does the 3Com Power of $Zero™ Solution work?**

The Power of $Zero™ Partnership has developed a product that, over a ten-year period, can effectively reduce all of Your expenses for Public Access Services to $Zero™.  Using the 3Com Power of $Zero™ Solution, We financially leverage the difference between the price You now pay for those services, and Our cost to provide those same services.  We then analyze Your monthly expense for Public Access Services, to verify that We can deliver those same services for less.  We then calculate this delta for the life of the Agreement, and return it directly to You, in the form of the Equipment Option, the Cash Payment Option, or both.

**3.   There is no such thing as a free lunch - This sounds too good to be true.**

That is the typical reaction when people first learn about our program –"What's the catch?"  But, there is no catch.  The true testimonial of the Power of $Zero™ Solution is what our existing customers (1,000 and growing) say about the program.  Please review, and feel free to contact, our customer references to confirm Our ability to deliver Your Public Access Services at $Zero™ additional cost.

**4.   If I don't sign the 3Com Power of $Zero™ Customer Agreement, where do I get Public Access Services?**

Public Access Services are typically owned, maintained, and repaired by the Incumbent Local Exchange Carrier ("ILEC") (e.g. SBC, Bell South, Verizon, Bell Atlantic, etc.).  However, Public Access Services can also be *provided, maintained, and supported* by either the ILEC or other Public Access Service Providers ("PAS Providers") (e.g. AT&T, MCI, or Capital 4).  3Com has selected Capital 4 as the PAS Provider under the 3Com Power of $Zero™ Solution.

**5.   Do I have a choice whether to use the ILEC, PAS Providers, or 3Com's designee - Capital 4?**

Yes. As the buyer of these services, You have the absolute right to select whether You purchase these Public Access Services from the ILEC, one or more PAS Providers, or from 3Com's designee - Capital 4.

**6.   If I sign the 3Com Power of $Zero™ Customer Agreement, what does that mean?**

By signing the 3Com Power of $Zero™ Customer Agreement, You are requesting that We become the *exclusive provider* of all of Your Public Access Services required at Your Place of Business, as noted on the Schedule "A" attached to the Agreement.  We are then responsible for providing, maintaining, and supporting all of Your Public Access Services required at Your Place of Business.

**7.   What actually happens when I sign the 3Com Power of $Zero™ Customer Agreement?**

When You sign the 3Com Power of $Zero™Customer Agreement, You grant Us power of attorney to transfer Your Public Access Services currently provided by the ILEC or PAS Providers.  Within 60 days of Your signing the Agreement, We will assume responsibility for providing the Public Access Services currently provided by the ILEC or PAS Providers.  From that date forward, We shall be responsible for providing, maintaining, and supporting - and providing billing for - Your Public Access Services at Your Place of Business.

**8.   Under the 3Com Power of $Zero™ Solution, can I obtain all of the services I am currently receiving from the ILEC or other PAS Providers?**

Yes.  We can provide all of the Public Access Services available from the ILEC or any of its competitors, the PAS Providers.

**9.   Will I experience any downtime during the conversion?**

No, as a general rule, the change from Your existing ILEC or PAS Providers is completely transparent.  To avoid any potential problems, We will coordinate the transition in advance, then call You on the day the change is being made.  This way, if a problem occurs, You will be "in the loop," and will know exactly what is going on.  Under normal circumstances, You should not experience any downtime during the conversion.

**10.   What if I have an existing contract, lease, or agreement for my Public Access Services or Voice Technology Solutions?**

As long as You have provided Us with all of Your existing agreements with the ILEC, PAS Providers, or others related to the expenses set forth in Schedule "A", We will discharge those obligations on Your behalf.  However, if You have not provided Us with all of those existing agreements and listed them in the expense items as set forth on Schedule "A", You will have to pay any termination charges for those agreements, and You will have to defend, indemnify, and hold Us harmless from all claims, demands, or liabilities arising from those agreements.

**11.   If I have an existing equipment lease obligation, how does it affect the values calculated in the Schedule "A"?**

The existence of a lease obligation for Your equipment impacts the value calculation under Schedule A, since it is necessary to discharge that lease as part of the 3Com Power of $Zero™ Solution.  Typically, the amount of the lease payoff, including the cost to finance, will be amortized over the term of Your 3Com Power of $Zero™ Customer Agreement.  In most circumstances, that additional amount will be added to Your Schedule "A" Monthly Payment; however, in some circumstances, We may assume that additional cost, as part of the transaction.

**12.   How does Capital 4 know what type or amount of Public Access Services I need?**

We are committed to provide the type and quality of services equal or better than those used by You at the time You execute the Agreement.  You are agreeing that Schedule "A" was put together from information that You provided, including actual copies of Your bills for services currently used at Your Place of Business. You must sign the Schedule "A" to verify that it contains an accurate itemization of Your current expenses for Public Access Services because We use and rely upon this figure as a benchmark to establish the value that can be delivered at $Zero™ additional cost.

**13.   What are my obligations to pay under the Customer Agreement?**

You are agreeing to pay to Us, or Our assigns, a monthly payment (the "Monthly Payment"), as set forth in the Schedule "A" on the day You sign the Agreement, and on the first day of each month following the date that We assume responsibility for providing the Public Access Services currently provided by the ILEC or PAS Providers. We may require that Your Monthly Payment be remitted directly to the holder of Your Funding Agreement.

**14.   What happens if I do not pay the Monthly Payment on time?**

Time is of the essence, which means that You have to pay, and You have to pay on time. So, if You don't pay Your Monthly Payments as required by Us, or Our assigns, on time, You are in breach of the Agreement. In that case, We shall no longer be obligated to provide Public Access Services. Moreover, if You have defaulted under the Funding Agreement, all amounts due, including penalties and other charges, shall become immediately due and payable by You.

**15.   How long does the 3Com Power of $Zero™ Customer Agreement last?**

Let's not beat around the bush, We want to keep You as a Customer for as long as You're satisfied with our products and services. Your 3Com Power of $Zero™ Customer Agreement remains in force and effect for 72 months from the Effective Date (the date We begin providing Your Public Access Services.) However, after just 60 months, You will be presented with Your choice of either a "Technology Refresh" (i.e. a new Voice Technology Solution) or an additional Cash Payment.

**16.   Is the Power of $Zero™ Customer Agreement the same as the Funding Agreement?**

No. The Funding Agreement is explicitly separate and distinct from the Customer Agreement.

**17.   What exactly is a Funding Agreement?**

The Funding Agreement is an agreement between You and Capital 4 Financial Services, a Program of De Lage Landen Financial Services. We use the Funding Agreement to financially leverage the difference in costs between what You pay for Public Access Services, and what it costs Us to provided those same services. The structure of the Funding Agreement provides for simple accounting treatment of the program's value, while maintaining the Monthly Payment as an operational expense.

**18.   Does that mean I have to pay both the Monthly Payment and the payment due under the Funding Agreement?**

No. As long as You are Our Customer, the payments You make under the Funding Agreement will be credited to Your Monthly Payment, as set forth on Schedule "A".

**19.   How do I qualify?**

We will evaluate Your credit profile, as reported by Credit Reporting Agencies. In the event Your public credit information is challenged, You agree to provide requested credit information, including financial statements, and, if required, guarantees; and to timely execute all required funding applications and Funding Agreements.

**20.   Can I make the Monthly Payments electronically?**

Absolutely. As a condition of your acceptance of the Agreement and the Funding Agreement, You agree that We shall automatically draft the Monthly Payment as an electronic funds transfer from Your bank account.

**21.   Is my Monthly Payment fixed, or will it reflect increases/decreases in usage?**

The Monthly Payment is a fixed amount due, as set forth in the on Schedule "A." We recognize that long distance usage and other measured sensitive services may fluctuate each month. To that extent, We will reconcile increases or decreases in usage by issuing credits/debits on a quarterly basis, unless a different term is selected.

**22.   What happens if I don't qualify for a Funding Agreement?**

If You don't qualify for a Funding Agreement, We still wants You as a Customer. In that case, We shall immediately begin remitting to You a monthly distribution (the "Monthly Distribution") for a portion of the Cash Payment as noted in the Schedule "A." We will continue to pay You that Monthly Distribution for the term of this Agreement.

**23.   What if I receive the Monthly Distribution, and then later qualify for a Funding Agreement?**

If you are receiving the Monthly Distribution, We will continue to seek credit approval for You. When You do qualify, and the Funding Agreement is signed and accepted, We shall pay You the full amount of the Cash Payment set forth on the Schedule "A." Beginning on the date that the Funding Agreement is signed and accepted, the term of this Agreement shall be extended for a period of 72 months.

**24.   Will I ever have to pay more than the amount of my Monthly Payment?**

Your Monthly Payment will not change. Usage additions and deletions, or substitution of vendors, will be reflected on Our statements. So, if You add or delete lines, use more or less long distance, or choose or substitute a different vendor that is more or less expensive, those amounts will be credited or debited to Your monthly statement.

**25.   Can I add or delete products and services that Capital 4 provides?**

Yes. At any time, You may add or delete any single product or service that We provide. For example, You may need to add additional phone lines or long distance minutes when Your business grows. When this happens, additional trunk lines can be added at a cost not to exceed $30.00 per month, including sales tax. Likewise, long distance minutes in excess of the "benchmark" minutes set forth in the Schedule "A"), shall be billed at an amount not to exceed $.05 per minute. Conversely, if You need fewer trunk lines or less long distance minutes (as compared to the "benchmark" minutes as set forth in Schedule "A"), You will be credited at the same rates. Billing for increases or decreases in usage shall be as set forth above.

**26.   During the Term of the 3Com Power of $Zero™ Customer Agreement, can I just switch to another PAS Provider or the ILEC?**

Not unless you first obtain Our approval. We have selected a group of PAS Providers that, in Our opinion, represent the best alternatives in the market. If at any time You become dissatisfied with any one vendor or provider, You can request that it be replaced by another, either selected by You or recommended by us. If the services provided by the new vendor or provider costs less that what it cost Us to purchase the same services, You will be credited with the savings, and if the services cost more, You will be charged the additional cost. However, if You obtain Public Access Services from a vendor or provider without first obtaining Our written consent, You will materially breach the Agreement, which then excuses Us from further performance. In that event, all amounts You owe Us under the Agreement, and under the Funding Agreement shall be immediately due and payable.

*How does the 3Com Power of $Zero Solution Work*

27.  **What if I am not satisfied with one of the products or vendors supplied?  Can I ask to have it replaced?**

Yes,. We always leave the final choice up to You.  If You're not completely satisfied with a vendor or product that We have provided, You can substitute with one of Your own choosing, at any time.  You simply have to tell Us to substitute a new vendor (that You select).  You will be credited the savings or billed the difference between the costs which We pay to the current vendor and the costs paid to the substituted vendor You select.

28.  **How long does the 3Com Power of $Zero™ Customer Agreement last?**

The "standard" Agreement is for 72-months. Longer terms may available to qualified companies, in which case it may increase the Cash Payment or value of the Equipment Option.

29.  **What happens if we later need to add more telephones?**

Typically, when You add more phones, You will also add additional Public Access Services.  So, when You purchase additional Public Access Services from Us, We may be able to deliver the additional phones at $Zero™ additional cost to You.

30.  **What if the applicable Public Utilities Commission orders a rate change for Public Access Services?**

Our rates are benchmarked with Tariffs as approved by the Public Utilities Commissions in each of the 50 states.  Increases or decreases in these Tariffs shall be treated as a pass-through, and Your bill shall be increased or decreased accordingly.

31.  **What happens if the rates for Public Access Services go down?**

Since We reduce Your costs to $Zero™ from day one, We cannot imagine costs from other companies to ever be less than $Zero™.

32.  **Can I cancel the 3Com Power of $Zero™ Customer Agreement in its entirety?**

Yes.  You have the option to cancel the Agreement at any time.  If We fail to perform, and good cause ("Good Cause") exists, You may cancel the 3Com Power of $Zero™ Customer Agreement.

33.  **What do I have to do to cancel the 3Com Power of $Zero™ Customer Agreement for Good Cause?**


To cancel the Agreement, you must demonstrate that Good Cause exists.  To do so, You must timely, and as soon as practicable (on the day You became aware of a problem), provide Us with written notice (via e-mail or facsimile) of any alleged failure or deficiency in the goods or services.; and You must allow Us commercially reasonable notice and opportunity to address and resolve the problem.  If You have documented an alleged failure or deficiency, but You are not satisfied with Our responsive action, You must *immediately* provide Us with written notice (via e-mail or facsimile, *and* by certified mail) specifying: (1) the problem; (2) Our response, including an explanation of why Our attempts to resolve the problem are alleged insufficient.  If We fail to fix the problem and make You a satisfied Customer within two (2) business days of Our receipt of this written notice of insufficiency, You may invoke the Good Cause provision to cancel the Agreement.  (However, such cancellation shall not constitute a waiver of Our right to assert that Good Cause did not exist.)


34.  **What happens to my obligation under the Funding Agreement if the 3Com Power of Zero™ Customer Agreement is terminated for Good Cause?**

If the Agreement is properly terminated for Good Cause, You grant Us Power of Attorney to pay, on a monthly basis, on Your behalf, damages in an amount sufficient to satisfy and discharge Your remaining payment obligations to any third-party funding source that has advanced funds under a Funding Agreement. We will pay these damages, even though You are not making Monthly Payments to Us.

35.  **What happens if I don't need a new 3Com Phone System right now?**

The delivery of a Next Generation Voice Technology Solution at absolutely $Zero™ additional cost to Your business is arguably the best way for You to maximize the value proposition for Our program.  However, We recognize that You may not yet be ready to deploy, or otherwise may not need, a new 3Com Voice Technology Solution. In this instance, We can accept the transaction using Your existing Voice Technology, providing You with the Cash Payment Option, instead.

36.  **If I select the Cash Payment Option, how quickly can I get the check?**

We can deliver the check as soon as You are credit approved, which can occur in as little as 24 hours after signing.

37.  **If I select the Cash Payment Option using my existing Voice Technology Solution, what happens?**

If You select the Cash Payment Option using Your existing Voice Technology, you agree to convey to Us and Our assigns, Your existing Voice Technology.  If it is encumbered (which must be noted on Schedule "A"), We agree to discharge Your obligation, in order to acquire clear title, so the Voice Technology can, be used as collateral.

38.  **If I select the Cash Payment Option, can I later exchange my Cash Payment for a new 3Com Voice Technology Solution?**

Yes. At any time during Our relationship, You can upgrade your Voice Technology. Part or all of the Cash Payment can be refunded in exchange for a new 3Com Voice Technology Solution, subject to the execution of a new Funding Agreement.

39.  **Do I get a bill or statement for usage? If so, What is Capital 4's billing cycle?**


Yes.  Each month, Capital 4 Financial Services will provide You with an invoice for Your 3Com Power of $Zero™ Monthly Payment, which, unless otherwise authorized, will reflect the electronic funds transfer from Your bank account.  On a monthly basis, We will also provide You with a 3Com Power of $Zero™ Statement that is used to reconcile any adjustments to your original 3Com Power of $Zero™ contract amount, which is used as the benchmark or standard.  The Statement also provides additional helpful information in managing Your account (e.g. long distance call records are displayed in detail on your Statement).  As always, You have a total relationship, single-source contact with Your local 3Com Power of $Zero™ Solution Partner, who can assist You with any billing questions that may arise.

40.  **If I select the Equipment Option, is new cabling included?**

If new cabling is required in order to support the implementation of the 3Com Power of $Zero™ Solution, then these requirements become part of Our contribution to You.  However, depending upon Your location, a surcharge may be required.  Please contact Your 3Com Power of $Zero™ Solution sales representative to determine if cabling in Your area necessitates a surcharge.

41.  **I am unfamiliar with this new equipment.  What about training?**

Your local 3Com Power of $Zero™ Solution Partner will provide You with all the training required at $Zero™ additional cost, for as long as You are Our Customer.

**42.   If I select the Equipment Option, is there a charge for service?**

We are committed to deliver repair service at $Zero™ additional cost for as long as You use the equipment.  This includes any and all software releases as developed by 3Com to ensure Your system is always kept current for software patches and maintenance releases (within the same major revision).  By example, if Your system is currently operating with 5.1.1 software, then all releases through 5.9.9 are made available at no additional cost to You.  By electing to renew Your Agreement, You may be eligible to receive a "technology refresh" or a complete system upgrade.

**43.   Who do I call if there is a service problem? Will Capital 4 resolve internet, local lines, long distance, and data issues?**

If You have any service issues related to Your Public Access Services, please immediately notify Your local 3Com Power of $Zero™ Solution Partner.  Our helpful customer service representatives are ready to solve Your problem.  If You selected the Equipment Option, then Your equipment service issues will also be resolved, and all of the repair service will be provided to You at $Zero™ additional cost.

**44.   If I select the Equipment Option, is a warranty included?**

Absolutely. Customers selecting the Equipment Option receive the $Zero™ Cost Warranty, protecting the Customer's equipment for service or repairs for a period of 72 months from the date of installation. The warranty is provided by 3Com, and by Technology Warranty Solutions ("TWS").

**45.   What else does the $Zero™ Cost Warranty cover?**

The $Zero™ Cost Warranty, provided through TWS, also protects Our responsibilities to You, including the administration and delivery of Your Public Access Services.  If We become insolvent, TWS shall assume Our obligations, administering and delivering the Public Access Services to You, as long as You make the Rental Payments.

**46.   If I select the Equipment (Voice and Data Technologies) Option, exactly what happens on the first day of the Agreement, and on the first day of the sixth year of the Agreement?**

By selecting the Equipment (Voice and Data Technologies) Option, You have chosen to receive value in the form of a state-of-the-art 3Com Voice and Data Technologies Solution to be delivered, as soon as Your executed Funding Agreement has been accepted.  Upon acceptance, the 3Com Voice and Data Technologies Solution will be delivered to You.  Then, during the last year of the Agreement (between the 60th and 72nd months of the Agreement's term), You will have the opportunity to enter a new Customer Agreement.  Depending upon the age and condition of Your equipment, You will once again have the option to select the Cash Payment Option, the Equipment (Voice and Data Technologies) Option, or the Equipment (Voice and Data Technologies) & Cash Payment Option, in which case, You will be entitled to the value You select.

**47.   If I select the Cash Payment Option, exactly what happens on the first day of the Agreement, and on the first day of the sixth year of the Agreement?**

By selecting the Cash Payment Option, You have chosen to receive value in the form of a Cash Payment to be delivered as soon as Your executed Funding Agreement has been accepted.  Upon acceptance, the Cash Payment will be delivered to You.  Then, during the last year of the Agreement (between the 60th and 72nd months of the Agreement's term), You will have the opportunity to enter a new Customer Agreement.  Depending upon the age and condition of Your existing equipment, You may be able to select the Cash Payment Option; however, it is more likely that You will want to select the Equipment (Voice and Data Technologies) Option, or the Equipment (Voice and Data Technologies) & Cash Payment Option, in which case, You will be entitled to the value You select.

**48.   If I select the Equipment (Voice and Data Technologies) & Cash Payment Option, exactly what happens on the first day of the Agreement, and on the first day of the sixth year of the Agreement?**

By selecting the Equipment (Voice and Data Technologies) Option & Cash Payment Option, You have chosen to receive value in the form of a state-of-the-art 3Com Voice and Data Technologies Solution and a Cash Payment to be delivered, as soon as Your executed Funding Agreement has been accepted.  Upon acceptance, the 3Com Voice and Data Technologies Solution and the Cash Payment will be delivered to You.  Then, during the last year of the initial term of Agreement (between the 60th and 72nd months of the Agreement's term), You will execute a new Customer Agreement, to extend the Agreement to the second term of equal length.  At that time, You will receive and additional payment of one-half the cash, or a "technology refresh".  You will also be required to execute another Funding Agreement.

**49.   How long has Capital 4 been in business?**

Our company has a history that spans more than 20 years.  The 3Com Power of $Zero™ Solution, launched in partnership with the 3Com Corporation, is now a nationally available program, endorsed by some of the world's largest and most respected institutions.

**50.   How many customers are benefiting from the 3Com Power of $Zero™ Solution?**

Based upon Our current projections and the national rollout, we should have more than 5,000 customer by the end of 2005.

**51.   Where is Capital 4 located?**

Our corporate offices are located in Houston, Texas.

**52.   What are all of the other terms of the 3Com Power of $Zero™ Customer Agreement that apply, and that I need to know about?**

All of the terms of the transaction between You and Capital 4 are set forth in the 3Com Power of $Zero™ Customer Agreement, including the attached Schedule "A", and this section of the 3Com Power of $Zero™ Solution website (titled, "How does the 3Com Power of $Zero™ Solution Work?") which is specifically incorporated by reference.

Customer represents that he/she is competent to execute the Agreement; and is not relying upon any promise or representation of any kind made by any other party, except as expressly stated in the Agreement.  The Agreement supersedes any and all prior agreements, arrangements, or understandings between the parties relating to this transaction, and no oral understandings, statements, promises, or inducements contrary to the terms of the Agreement exist.

The Agreement shall not be amended, altered, or modified in any way unless in writing and executed by the parties.  The invalidity or unenforceability of any particular provision of the Agreement shall not affect any other provision, and the Agreement shall be construed in all respects as if such invalid or unenforceable provision was omitted.  Unless otherwise specified, any notice under the Agreement shall be in writing and shall be sent by certified mail, return receipt requested, at the address for Capital 4 and Customer set forth in the Agreement.

The Agreement shall be governed by, construed, and enforced in accordance with, and subject to, the laws of the State of Texas.  The parties hereby irrevocably and unconditionally consent to the exclusive jurisdiction of the courts of the State of Texas and of the United States of America located in the State of Texas, Harris County for any actions, suits, or proceedings arising out of or relating to the Agreement.  The parties shall not commence any action, suit, or proceeding arising out of or relating to the Agreement in any court other than those specified.